**Gloria PRICE, et al., Plaintiffs,**

v.

**UNITED STATES NAVY,
et al., Defendants.**

**And Related Counter–Actions.**

No. 89–1526–IEG (CM).

United States District Court,
S.D. California.

Dec. 4, 1992.

John H. Reaves, Law Offices of John H. Reaves, San Diego, CA, for plaintiffs.

David M. Thompson, U.S. Dept. of Justice, Environmental Defense Section, Washington, DC, Beth L. Levine, Office of the U.S. Atty., S.D.Cal., San Diego, CA, David W. Zugschwerdt, U.S. Dept. of Justice, Washington, DC, for defendant U.S. Navy.

Shawn F. Kelly, Law Offices of Shawn Kelly, San Diego, CA, for defendant Michael Moses.

Harry Moses, in pro per.

## MEMORANDUM DECISION AND ORDER

GONZALEZ, District Judge.

The above-entitled matter came before the court for trial without a jury on October 8, 9, 14, 15, 16, 20, 21, 22 and 23, 1992. John H. Reaves, Esq. appeared on behalf of plaintiffs. David M. Thompson, Esq. and Beth L. Levine, Esq. appeared on behalf of defendant, United States Navy.[1] Shawn F. Kelly, Esq. appeared on behalf of defendant, Michael Moses, and defendant, Harry Moses, appeared in propria persona. Having considered the testimony and evidence, the Court makes the following findings of fact and conclusions of law.

This Court has jurisdiction over this matter pursuant to 42 U.S.C. § 9613(b) and 28 U.S.C. § 1331. Venue is proper in that the incident that gave rise to this action occurred within the Southern District of California.

Plaintiffs Gloria Price and Elizabeth Jean Bolton ("Jean Bolton") seek relief in count one of the first amended complaint under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601–9675.[2]

This Court dismissed count two which sought relief under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901–6992k on October 22, 1992.[3] On that same date the Court dismissed the third,

---

1. David W. Zugschwerdt appeared on behalf of the United States Navy on October 20, 1991.

2. On October 2, 1992, the Honorable Earl B. Gilliam entered an order dismissing the other six private plaintiffs from counts one and two. All plaintiffs remained with respect to the other causes of action.

3. On November 13, 1992, this Court denied plaintiffs' motion for reconsideration and affirmed its order granting defendant's motion for judgment on partial findings.

fourth and tenth claims against the Moses wherein plaintiffs sought damages for nuisance, negligence and medical monitoring under CERCLA, respectively.

In the mid–1930s, the United States Navy took paints (containing lead, copper and zinc), used asbestos gaskets and insulation to a junkyard in Paradise Hills in San Diego, California. The junkyard included what is now 6021, 6025, 6035 and 6045 Edgewater Street, San Diego, California, four contiguous properties. At some point, the property was converted into a plant nursery and in July, 1958, the property was purchased by Harry and Marguerite Moses.

At the time that Harry Moses purchased the property, he observed old potted plants and pieces of pottery which led him to believe that a nursery had previously been located there. He also discovered some other foreign objects in the soil such as burnt material and pieces of debris. From this, Mr. Moses assumed that garbage had been burned on the site.

In 1960, Harry Moses built the homes located at 6021 and 6025 Edgewater.[4] The only preparation of the lots which Harry Moses performed before actual construction of the homes began, was to remove a tree and potted plants. Mr. Moses hired a contractor to actually build the homes although Mr. Moses personally obtained the building permits. The gas and plumbing permits, however, were obtained by a plumber.

The plumbing permits for 6021 and 6025 Edgewater indicate that "Mike" or "Michael" Moses was the owner of these properties. (Exhibits 41 and 42). However, the Court finds this evidence wholly unreliable. The plumber completed the information contained on the gas and plumbing permits and the information was never verified by county officials. No other admissible evidence was presented at trial to show that Michael Moses had any ownership rights in the 6025 and 6021 Edgewater properties. Moreover, there is no evidence that Michael Moses was a partner with his father in the construction of the two homes. Therefore, plaintiffs have failed to meet their burden of proof as to Michael Moses under CERCLA.

On occasion, Harry Moses observed construction in progress at 6025 Edgewater. A trench was dug so that concrete footings could be placed in the soil around the perimeter of the slab at 6025 Edgewater. The soil excavated for the trench was placed out onto the lot and later put back into the trench. The footings had to extend farther down than one foot so as to meet solid ground. Harry Moses understood that there was fill material down to approximately three feet from the surface of the lot at 6025 Edgewater, but as stated before, did not know the fill may have been a junkyard at one time.

Although Mr. Moses' testimony about the persons he hired as the contractor and subcontractors to build the homes contradicts some of what he may have said in his deposition, the Court finds that these inconsistencies go to matters that are not material. In addition, it is not surprising that an 86–year old man cannot remember some details about the construction of the homes and his observations of the site that occurred more than 30 years ago.

In June, 1962, Mr. and Mrs. Pablo Gonzalez and Mr. and Mrs. Moses entered into an agreement for sale of the property located at 6025 Edgewater. Soon, thereafter, the Gonzalez family moved into the home. When Mr. Gonzalez died in 1977, his daughter, Jean Bolton's name was added to the 6025 Edgewater deed. After Mrs. Gonzalez died in August, 1988, plaintiff Bolton became the sole owner of the home. Plaintiff Bolton intended to keep the home among the Gonzalez siblings. However, in September, 1988, the Gonzalez siblings agreed that their sister, Gloria Price, should be able to purchase the home for a total of $80,000.00. Plaintiff Price obtained a loan for that amount and paid her siblings (plaintiff Bolton and two brothers) $20,000.00 each. Title, however, has always remained in the name of plaintiff Bolton.

At the time that plaintiff Price purchased the home at 6025 Edgewater, her daughter, Bethany, and granddaughter, Melissa, her brother, Stephen Gonzalez and another brother, William Gonzalez, his wife and three children were living in the home. Plaintiff Price never lived full time at 6025 Edgewater

4. At some time Michael Moses built the home at 6035 Edgewater.

before January, 1990. She would spend nights at plaintiff Bolton's home and baby-sit during the days for her granddaughter, Melissa at the 6025 Edgewater residence.

In October, 1988, plaintiff Price hired KDI Sylvan Pools, Inc. ("Sylvan") to construct a pool in the back yard of 6025 Edgewater. Excavation for the pool resulted in piles of dirt being placed by Sylvan in the back, side and front yards of that residence and in the neighbors' yard. During the pool excavation Sylvan discovered what it believed to be asbestos in the soil. The Court finds that Sylvan did not know any toxic waste materials were in the soil before excavation of the pool actually began.

On October 26, 1988, Sylvan contacted the San Diego County Department of Health Services. Nick Vent, a County employee, responded and went to the residence. Mr. Vent observed torn gaskets and lagging from pipes in the soil which Sylvan dumped in the back and front yards of 6025 Edgewater and in the back yard of the house next door. He took samples from the layer of debris back to the laboratory for testing. Tests confirmed the presence of asbestos. The County ordered that Sylvan discontinue its work and issued an official notice dated October 27, 1988, ordering that plaintiff Price contain and control the friable asbestos on and off her property (Exhibit 7).

The San Diego County Hazardous Materials Management District (HMMD) collected and analyzed 92 samples in and around the four subject properties (6021, 6025, 6035 and 6045 Edgewater). The results revealed asbestos in the front and back yards at 6025 Edgewater. Concentrations of lead above the State TTLC levels [5] were found in two samples taken from borings on the 6025 Edgewater property. (Exhibits 34 and 35). According to Larry Bodenhamer of the San Diego County Department of Health Services, no borings, samplings or testings were performed on soil *under* the slab of the home located at 6025 Edgewater.

Plaintiff Price, having worked at an occupational and health office, and believing that her health and especially the health of the children living at 6025 Edgewater was in

danger, moved everyone out of the home to her sister Jean Bolton's residence. No official agency had asked plaintiff Price to move her family from 6025 Edgewater. The County could not tell her one way or another if there was a risk. Mr. Brad Shipley of the U.S. EPA felt that the risk involved by remaining at the home was no more than the risk one encounters in every day situations.

Dr. Louis Levy, staff toxicologist with the California Department of Health Services, testified that there were hazardous levels of lead located on the surface and below the surface of the site at 6025 Edgewater. Lead is particularly hazardous to children under six. Ingestion of dirt is the way by which a person becomes exposed to hazardous levels of lead. Dr. Levy agreed that if lead which is contained in the soil is covered by concrete the exposure pathway is blocked, i.e., it cannot be ingested.

In November, 1988, plaintiff Price expended $30,153.56 to remove the large piles of contaminated soil that had been transported and deposited in her yard and her neighbors' yard by Sylvan during the pool excavation. This action was necessary as a result of the official notice which required plaintiff Price to remove the contaminated material. Plaintiff Bolton loaned plaintiff Price $12,000.00 to be applied toward the cost of the cleanup.

Plaintiff Price lived at plaintiff Bolton's home from October, 1988, to January, 1990 (until completion of the State cleanup). The concern of plaintiff Price over the presence of asbestos and hazardous levels of lead in the soil at 6025 Edgewater justified the relocation of her family to the Bolton residence.

The individuals who moved into plaintiff Bolton's residence included Gloria Price; her daughter, Bethany, and granddaughter, Melissa; her brother, William, and his wife and three children; and her brother, Stephen. William Gonzalez and his family moved out of the Bolton residence upon the close of escrow for their new home which occurred approximately six to eight weeks after the relocation in October, 1988.

Plaintiff Bolton testified that her household expenses, which included utilities and

---

**5.** TTLC means the total threshold limit concentration as defined in the California Code of Regulations, Title 22, Article 11, Section 66696. (Exhibit 28).

food, increased as a result of the relocation of her family members. The expenses for food and utilities increased approximately $400.00 to $450.00 per month and after her brother and his family moved out, the expenses dropped by approximately $175.00 a month. Therefore, after January 1, 1989, plaintiff Bolton's expenses increased by approximately $275.00 until January, 1990. This Court accepts the testimony of plaintiff Bolton, and there is no testimony to the contrary, that for two months her increased costs were $450.00 per month and that for 13 months, her increased costs were $275.00 a month, for a total of $4,475.00.[6]

On July 5, 1989, the State of California, Department of Health Services, Toxic Substances Control Division, determined that, "There may be an imminent and substantial endangerment to the public health, welfare and the environment at the Paradise Hills Hazardous Substances Release Site." (Exhibit 30). The State based its determination on the fact that the presence of metals which included lead, zinc and copper, and asbestos in the surface soils at the site (6021, 6025, 6035 and 6045 Edgewater) demonstrated that there had been a release of hazardous substances; and that immediate action was necessary to prevent further ingestion of contaminants by children, residents and relatives of residents living at or visiting the site. As a result, the State decided that immediate remedial action was necessary.

The U.S. EPA had previously decided that there was not an imminent and substantial endangerment to health or environment at the four lots and concluded that CERCLA removal action was not appropriate.

From December, 1989 to January, 1990, the State of California performed a cleanup of the yards at 6021, 6025, 6035 and 6045 Edgewater. The total cost of the cleanup incurred by the State was between $382,000.00 and $400,000.00 (Exhibit A–N and testimony of Lawrence Vitale).[7] The State hired International Technology Corporation (hereinafter "IT") to remove the contaminants at the Paradise Hills project. IT's removal and remedial action included excavation down to three feet of the entire back yards of 6021, 6025 and 6035 Edgewater wherein clean fill replaced the contaminated soil which was taken to a dump site and buried. Concrete was placed along the side yards at 6021, 6025 and 6035 Edgewater. In addition, IT placed new sod in the front and back yards and decorative slabs and a new fence in the back yard of 6025 Edgewater. IT did not dig under the driveway nor under the home at 6025 Edgewater.

Lawrence Vitale, the State's project manager during the site cleanup, had the responsibility of overseeing the project and making sure the State procedures were followed. Prior to the cleanup, Mr. Vitale concluded there was no threat to ground water, surface water or air by the contaminants. The State's paramount concern was the ingestion of soil which contained hazardous levels of lead.

After the cleanup was completed, in January, 1990, IT collected soil samples. A total of six borings were made, some to a depth of approximately 17 feet below ground level at the site. The soil samples were turned over to Mr. Vitale. The samples revealed that no contamination remained in any areas at the site. This included a boring taken from beneath the foundation of the 6021 Edgewater residence. No boring or sample was taken from beneath the foundation at 6025 Edgewater.

Mr. Vitale opined that, as a result of the cleanup, there is an environmentally safe residential area at the site. The contaminated soil was removed and buried. The concrete in the side yards, driveways and foundations has created a barrier to the release of any contaminants which may lay beneath the soil in these areas.[8]

---

6. Plaintiffs presented no other evidence of relocation expenses at trial, including but not limited to the rental value of a home comparable to plaintiff Price's home.

7. The United States repaid the State approximately $370,000.00 for expenses incurred as a result of the cleanup.

8. During the cleanup, Mr. Vitale had the opportunity to observe debris, which was not removed in the soil beneath the foundation at 6025 Edgewater. He testified that hazardous materials likely exist in this soil.

Mr. Vitale became aware of cracks in the slab in the home at 6025 Edgewater, specifically cracks in the living room and bathroom. According to Mr. Vitale, the cracks can be repaired without disturbing the foundation of the home. He feels no exposure will be created by filling the cracks. In fact, soil and dust discovered in the crack in the bathroom tested negative for contaminants.

Mr. Vitale and others on behalf of the State of California, Department of Health Services signed a remedial action certification form (Exhibit 31) after the State finished its cleanup. According to the certification, "all appropriate response actions have been completed, ... all acceptable engineering practices were implemented and ... no further removal/remedial action is necessary.". The certification goes on to say that a deed restriction will be placed on the properties to notify "future owners that hazardous waste remains beneath current residents' homes." Mr. Vitale testified that presently there is *no* imminent and substantial endangerment.

On October 16, 1991, plaintiff Bolton signed a covenant to restrict use of the property at 6025 Edgewater Street. (Exhibit 12). To date, the deed restriction has not been recorded. The deed restriction is a notice that the property at 6025 Edgewater has been used for disposal of hazardous wastes; that hazardous wastes remain in the soils beneath the residence on the property and that if these wastes should become uncovered, exposure to the contaminated soils may occur.

John Scandura of the California Department of Health Services testified that he believed hazardous waste remains in the soil beneath the residence at 6025 Edgewater. However, the structure and concrete on the lot are barriers to the release of contaminants.

Mr. Scandura testified that if the house or driveway slabs are disturbed so as to expose soil, remediation *might* be required, depending on the type and level of contaminants present in the soil. Nevertheless, there is presently no imminent and substantial endangerment and there is presently no release of a hazardous substance.

After learning of the contamination in her soil, plaintiff Price consulted with an attorney, Kerry Tepper. According to plaintiff Price, the attorney's fees incurred as a result of Tepper's services were $5,473.71. Eventually, Tepper did not feel that he was in a position to pursue a lawsuit in this case and therefore, he assisted plaintiffs Price and Bolton in finding an attorney who could handle the job. In February 1989, plaintiffs hired attorney John Reaves. The plaintiffs entered into a fee agreement (Exhibit 46) with Mr. Reaves. This lawsuit resulted against the Moses defendants, Sylvan and the United States Navy. Eventually, plaintiffs received $30,000.00 from Sylvan as a result of a settlement. The Court finds that the $30,000.00 payment received from Sylvan was for the cleanup and associated costs as alleged by plaintiffs in the present lawsuit.

In a lawsuit filed in State Court by plaintiffs Gloria Price and Jean Bolton against various insurance companies, the plaintiffs alleged a breach of insurance contract, bad faith, and sought declaratory relief. Plaintiffs alleged defendants failed to timely respond to plaintiffs' claims under the policy for response costs. That case was eventually settled and plaintiff Price received a total of $250,000.00 from two different insurance companies. The Court finds that the proceeds were not received for cleanup and associated costs.

■ The total current charges for attorneys' fees as a result of the present litigation is $290,291.08. The total fees paid to date by plaintiff Price is $122,002.26 and the total fees at risk pursuant to the fee agreement is $286,278.48. (Exhibit 55).[9]

■ CERCLA imposes strict liability upon owners and operators of facilities at which hazardous substances were disposed. *Idaho v. Hanna Mining Co.*, 882 F.2d 392, 394 (9th Cir.1989).

In order to promote the objectives of CERCLA, that is, providing for liability,

---

**9.** The Court has determined that attorneys' fees are not response costs pursuant to CERCLA § 107(a), 42 U.S.C. § 9607, and this issue has been addressed in a separate opinion dated October 21, 1992, 818 F.Supp. 1322.

compensation, cleanup and response for hazardous substances into the environment, Congress has created a private right of action for certain response costs against certain persons who contributed to the dumping of hazardous waste at a site. *3550 Stevens Creek Assoc. v. Barclays Bank of California*, 915 F.2d 1355, 1357 (9th Cir.1990); *Ascon Properties, Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1152 (9th Cir.1989); *Wickland Oil Terminals v. Asarco, Inc.*, 792 F.2d 887, 890–92 (9th Cir.1986).

■ To prevail in a private cost recovery action, plaintiff must establish that the site on which hazardous substances are contained is a "facility" under CERCLA's definition of that term, that "release" or "threatened release" of any hazardous substance from the "facility" has occurred, that such "release" or "threatened release" has caused plaintiff to incur "response costs" that were necessary and consistent with the national contingency plan and that defendant is within one of the statutory classes of persons subject to liability. *3550 Stevens Creek Assoc.*, 915 F.2d at 1358.

■ Plaintiffs have not met their burden of proof that Harry Moses knew a junkyard existed at 6025 Edgewater or that toxic waste had been dumped on the site. However, because plaintiffs have met their burden of proof that Harry Moses was a past owner of the subject property (6025 Edgewater) during a time that "disposal" of "hazardous substances" occurred at the subject property which resulted in a "release" or "threatened release", causing plaintiffs to incur "response costs" consistent with the national contingency plan, Mr. Moses is liable under CERCLA. The Court finds that Harry Moses is liable for only one percent (1%) of the "response costs" incurred by plaintiffs. CERCLA § 107(a), 42 U.S.C. § 9607(a).

■ The Court also finds that based upon the evidence, Sylvan "disposed" of "hazardous substances" at a "site" which resulted in a "release" or a "threatened release" which caused plaintiffs to incur "response costs". The Court finds that Sylvan is only four percent (4%) liable for any "response costs" incurred by plaintiffs.

■ Finally, plaintiffs also have met their burden of showing that the United States Navy was a "transporter" of "hazardous substances" to a "facility" and that there was a "release" of "hazardous substances" at a "facility". The United States Navy is ninety-five percent (95%) liable for any "response costs" incurred by plaintiffs.

Plaintiff Price incurred $30,153.56 in "necessary" cleanup "response costs" consistent with the national contingency plan. CERCLA § 107(a), 42 U.S.C. § 9607(a).

The Court finds that relocation was necessary and that plaintiff Bolton incurred relocation costs in the amount of $4,475.00.

CERCLA provides for contribution from other potentially liable entities using such equitable factors as the Court determines is appropriate. CERCLA § 113(f)(1), 42 U.S.C. § 9613(f)(1). Here, the Court has found that Sylvan contributed to the release of hazardous waste. Therefore, Sylvan is responsible for proportionate share of response costs. As stated before, that share is four percent (4%) of the total response costs incurred.

The Court has also found that Harry Moses has contributed to the release of hazardous waste and, therefore, is contributorily liable for his proportionate share of response costs. As stated before that proportionate share is one percent (1%) of the total response costs incurred.

■ The Court finds that plaintiff Price is not responsible for any release of hazardous waste as a result of hiring Sylvan to excavate for a swimming pool.

■ CERCLA provides that any person who receives compensation for removal costs pursuant to any other federal or state law is precluded from receiving compensation for the same removal costs under CERCLA. CERCLA § 114(b), 42 U.S.C. § 9614(b). Here, plaintiffs received a $25,000.00 reimbursement from the State of California for the cleanup and associated costs. In addition, plaintiffs received a $30,000.00 settlement for the private cleanup and associated costs. The Court finds that these payments were made pursuant to state and/or federal law. Thus, a setoff and credit for these payments from other sources reduces the

total amount of damages to which plaintiffs are entitled.

In sum, this Court finds that plaintiffs have met their burden of proof under CERCLA that the United States Navy and Harry Moses are liable for the cleanup and relocation costs, which the Court finds were necessary response costs incurred by plaintiffs under count one of the complaint. Plaintiffs incurred costs in the total amount of $34,628.56. The United States Navy is responsible for ninety-five percent (95%) of the costs incurred, Harry Moses is responsible for one percent (1%) and Sylvan for four percent (4%). However, since the Court has found that plaintiffs have received payments from other sources in the amount of $55,000.00, the net award to plaintiffs is zero. Each party shall bear its respective costs of suit.

Defendants are directed to prepare the judgment and submit it to the Court within two weeks of the date of this order.

**IT IS SO ORDERED.**